ELIZA B. HAWLEY *et al.*, Appellants, v. M. E. GRIFFIN, *et al.*, Appellees.

ELIZA B. HAWLEY *et al.*, Appellants, v. MICHAEL FELL *et al.*, Appellees.

ELIZA B. HAWLEY *et al.*, Appellants, v. FRANK M. BARNARD *et al.*, Appellees.

JOHN M. MASTERMAN, Appellee, v. ELIZA B. HAWLEY *et al.*, Petitioners for New Trial, Appellants.

M. E. GRIFFIN, Appellee, v. ELIZA B. HAWLEY *et al.*, Petitioners for New Trial, Appellants.

FRANK M. BARNARD, Appellee, v. ELIZA B. HAWLEY *et al.*, Petitioners for New Trial, Appellants.

Actions to Set Aside Tax Deeds and to Redeem: INCOMPETENT OWNER:   RIGHT OF HEIRS TO REDEEM:   EVIDENCE OF INCOMPETENCY.   The test of mental capacity is whether the person

possesses sufficient mind to understand in a reasonable manner the nature and effect of the act in which he is engaged; and one may be thoroughly insane on one subject and at the same time capable of transacting business on all others. Tested by these rules the evidence in this case, which is a suit to set aside tax deeds and redeem the land from tax sales by the heirs of the owner, is held sufficient to show that the owner was insane from a time prior to the sales until his death, and the heirs are entitled to redeem upon proper showing and within the required time.

**Vacation of Decree Against Insane Person:** GUARDIANSHIP. A decree quieting title in a grantee to lands purchased at a tax sale against an owner in fact insane, where no appearance was entered and where no guardian was appointed, is erroneous, even though there had been no judicial determination of the defendant's insanity, and his heirs may maintain an action to vacate the same if brought within proper time.

**Tax Sale.** INSANE OWNER: COMMENCEMENT OF ACTION TO REDEEM: SERVICE OF NOTICE. An action by the heirs of one who was insane to redeem from a sale lands sold for taxes. and to vacate a judgment quieting the title thereto in the grantees in the tax deeds, must be commenced within one year from the death of such insane owner, and a delivery of the original notice to the sheriff without actual service within the year is insufficient for that purpose; Code section 2532 having no application to cases arising under a statute creating the cause of action and also providing that the right shall be exercised within a fixed time.

**Vacating Decree to Quiet Title:** INSANE OWNER: PROCEDURE. A proceeding to vacate a decree quieting title in a grantee in a tax deed as against an insane owner, who makes no appearance and for whom no guardian is appointed, and which is instituted by his heirs, under Code section 3154 *et seq.*, differs from a proceeding in equity in the nature of a bill of review, in that the former is governed by the limitations contained in the statute authorizing the proceeding and the latter by the ordinary rules of procedure.

**Vacating Decree:** DEFENSE: COUNTERCLAIM. A decree quieting title will not be vacated under sections 3154 and 3159 of the Code of 1873 until a valid defense to the action has been adjudged, and a counterclaim or cross-demand will not avail for this purpose.

**Vacation of Decree by Heirs:** RIGHT TO REDEEM AS DEFENSE. Where the heirs of an insane owner secure the vacation of a

decree quieting title in a grantee in a tax deed on the ground of insanity and want of appearance either in person or by guardian, under section 3154 of the Code of 1873, they cannot interpose as a defense to the suit their right to redeem from the sale under sections 892 and 893.    Such a defense can only be pleaded as a counterclaim to the main action, and if upon vacation of the decree this right is extinguished by lapse of time the defense will not avail.

*Appeal from Clay District Court.*—HON. LOT THOMAS, Judge.

THURSDAY, OCTOBER 30, 1903.

OF the above-entitled actions, Nos. 2,300, 2,308, and 2,326 are suits in equity to set aside certain tax deeds, and redeem from tax sales under which defendants claim title to lands owned by plaintiffs' ancestor, John Irwin, in Clay county, Iowa.    Actions Nos. 497, 572, and 1,695 were originally brought by the plaintiffs named therein to quiet their title to the same lands above referred to, and decrees obtained as prayed for.    In these last-named actions, the parties who are plaintiffs in the first three actions above named appear and file a petition to set aside the decrees and for a new trial.    The district court denied the relief asked in each case, and the plaintiffs and petitioners appeal.—*Affirmed* in part, and *reversed* in part.

*R. S. Hall, Finley Burke, Geo. W. Covell* and *M. L. Hayward* for appellants.

*Carr & Parker* and *Richardson, Buck & Kirkpatrick* for appellees.

WEAVER, J.—Plaintiffs are the children and heirs at law of John Irwin, who died intestate October 20, 1893. The general outline of the controversy is as follows:    Mr. Irwin, who had been a country merchant in Ohio prior to the year 1856, came west about that time, bringing with

him a large number of soldiers' bounty land warrants, of
which he had obtained assignments, and by which he se-
cured title to several thousand acres of land in Iowa,
including the tracts in controversy, and a still larger area
in Nebraska. In the year 1865, the lands now in suit were
sold for the unpaid taxes of the years 1858 to 1864, inclu-
sive, and in 1871 were again sold for the unpaid taxes of
1870, and upon these sales treasurer's deeds were made to
the purchasers. Thereafter each of the holders of the tax
title to the several tracts of land in controversy brought
action in the Clay county district court to establish and
quiet said title in themselves, each making John Irwin a
party defendant. Service of original notice in each in-
stance was had upon Irwin in the state of Nebraska and,
he making no appearance, default and decree as prayed
was rendered against him more than a year prior to his
death. The claim now asserted by the Irwin heirs against
the tax title is that from a date prior to the tax sales down
to the time of his death their said ancestor was insane and
wholly irresponsible, and that the tax sales, treasurer's
deeds, and the decree of the district court confirming and
quieting such title are void and without any effect to devest
the title of Irwin. As we have before stated, Irwin died
October 20, 1893. The petitions in each of the six several
proceedings involved in this appeal were filed October 20,
1894. On the same day original notice in each case was
placed in the hands of the sheriff of Clay county, with
intent that the same be promptly served. Actual service
of such notice was had on the same day in cases 572, 1,695,
and 2,326, but in each of the other cases service was not
effected until a later date. The owners of the tax title
deny the alleged insanity of Irwin, deny that there were
any erroneous or irregular proceedings in obtaining the
decrees quieting their said tax title, and allege that, even
if the allegations of insanity be established, the actions to
redeem from the tax sale and the proceedings for a new

trial were not begun within one year from the death of
Irwin, and are therefore barred by lapse of time.

I.    The story of John Irwin's life, as disclosed by the
testimony, is an extraordinary one, but the record is by
far too voluminous to attempt a detailed rehearsal of the

1. INCOMPETENT facts.    As is usual in such cases, there is a
owner: right
of heirs to    large array of witnesses on either side, and
redeem:
evidence of    the opinions expressed by them as to the
incompe-
tency.        mental condition and capacity of Mr. Irwin
during the period from 1861 to his death, in 1893, are more
or less irreconcilable.    We have read and re-read the
record with much care, and after comparing the testimony
of all those who attempt to speak upon this subject; their
apparent intelligence; their personal acquaintance with
Irwin; their opportunities to observe his demeanor, con-
duct, and appearance; the degree of their intimacy with
him; the facts which they relate as the basis of their opin-
ions; and all other circumstances disclosed which tend to
affect the weight and value of their testimony,—we think
the following history, stated in outline, is clearly estab-
lished.    John Irwin, living in Ohio until middle life, was
evidently a pushing, thrifty, intelligent, and prosperous
business man.    Those who knew him there describe him
as of pleasing address, peaceable, quiet, cheerful, and at-
tentive to his own affairs, though somewhat peculiar in
his methods.    Evidently of a careful and saving dispo-
sition, he accumulated what in those days was counted
a competence.    There is nothing to show that during this
period of his life he failed to pay his taxes, or was want-
ing in due respect to the law or to law officers, or was any-
thing other than a good and orderly citizen.    About the
year 1856, as is commonly known, there was much specu-
lation in soldiers' bounty land warrants, then recently
made assignable.    Apparently Irwin became infected
with the speculative fever, and converting his means
largely, if not entirely, into land warrants, he came West,

and ultimately took up his home in Nebraska City; living there until he died, in 1893, at the advanced age of 94 years.   Soon after his arrival from the East, he located his warrants, and obained title to lands to an aggregate amount estimated at from forty-five thousand to fifty-five thousand acres.

About this time there was developed a marked change in the man's characteristics.   Always saving, he became miserly in small things, but the princely domain which a keen business instinct had led him to acquire he allowed to slip from his grasp without an intelligent effort to save it.   He denied the power of the state to tax his lands, or to sell them in satisfaction of tax liens.   The subject of taxation excited him to frenzy of anger.   He gave no clear or consistent idea of the theory upon which his opposition to taxes was based; sometimes declaring taxation to be unconstitutional, but more often that it was a scheme or conspiracy undertaken to rob him.   Sometimes he called himself "Lord Irwin" or "Earl Irwin," and said his property could not be taken.   His property, and the schemes of others by which he was being robbed of it, were ever in his mind, and the slightest touch upon the subject would cause an explosion of his wrath.   Indeed, he did not wait for any one to broach the subject, but forced it into every discussion, whether relevant or irrelevant.   He gathered crowds about him in public places and delivered harangues upon the subject of his wrongs, and rode up and down the streets shouting his grievances and vituperating his supposed enemies.   He haunted the courts with great regularity for years, taking his place within the bar, and persistently interrupted proceedings to demand some order or some relief against those whom he believed arrayed against him.   At times, when compelled to be a silent spectator of the proceedings, he would compliment a ruling which pleased him by arising and "making a courtly bow" to the presiding judge.

When an officer visited his place with a writ, he assaulted him with a deadly weapon.    In 1861 a horse of no great value belonging to him or to his wife was seized by the provost marshal (Judge Mason) for military use, but was soon returned uninjured.    Conceiving this to be a great wrong, he prepared an itemized bill of the damages he claimed to have sustained.    This bill, made out with great care, and consisting of separate items for the use of his horse, a broken hinge on his barn door, loss of hay crop, mental anxiety, loss of comfort in being deprived of the use of the horse for exercise, and numerous others of like fanciful character, aggregating over $9,000, he repeatedly sought to have collected by proceedings in the state and federal courts.    Taking it then before the legislature session after session, he was tireless in waylaying members and importuning them with apparent sincerity to support his claim.    This one topic seems to have been the only thing which in his mind could rival in importance the general subject of taxation and robbery.    The bill spoken of, or some document in reference to it, was ever in his pocket and ready to be brought forth and displayed to any one who would listen to him, or to be called to the attention of the court whenever permitted to interrupt its business for that purpose.    He became slovenly in his person, went thinly clad in the most inclement weather, and at times appeared upon the street in attire too scant for decency.    His talk was disconnected, his eye wild, and his voice loud, harsh, and imperious.    He collected in trunks and boxes large quantities of scraps of paper, of no apparent use or known purpose.    He refused to pay the taxes upon his home, and the title thereto was saved only through the intervention of friends in the interest of his wife.    Though making no effort to pay taxes, and seeing his property sold therefor, he refused all offers to purchase the equity left in himself.    When served with notice

of the suits brought by the defendants Griffin and others in Iowa, he gave the matter no attention. Steadfast and consistent in the idea that there was no power to tax his property, and that his title could not be lost, he went to the end of his long life without any apparent comprehension that he was imperiling the magnificent heritage to acquire which for his children he had given the best years of his life.

On the other hand, it is shown that in some respects he was not without shrewdness and intelligence. He was close and parsimonious in his purchases, haggling over prices and getting good bargains. Money he clung to with tenacity, and at his death had several thousand dollars in the bank. There was some evidence tending to show that two of his brothers and a grandchild were of unsound mind. Of the witnesses expressing an opinion of his mental condition, we think it must be conceded that a large majority of those who had known him longest and best—some of whom had known him intimately from the time of his arrival from Ohio—testify in unqualified terms that they believe him to have been insane from before the date of the tax sales to the day of his death. Among the witnesses testifying for the defendants, some show but slight and casual acquaintance with Mr. Irwin in his life time, while many of those who knew him better speak upon this subject in a guarded and qualified manner, and, while saying in a general way that they regarded him sane, add that he was "peculiar," "cranky," "eccentric," "a little off," etc. Of the physicians testifying in the case, six, who appear to be men of the learning and ex‑ perience which give weight and value to their statements, and the only expert witnesses who speak from close ac‑ quaintance and observation of Mr. Irwin, say unhesitat‑ ingly that he was insane,—the victim of monomania upon the subject of taxation and property rights None of these spoke in answer to hypothetical questions, but from per‑ sonal knowledge and observation of the man. Two med‑

ical witnesses were called by the defendants, but the acquaintance of neither with Irwin was close or intimate. The expert testimony, therefore, like that of nonexpert witnesses, preponderates largely in favor of the theory of insanity.    The test of mental capacity is said to be whether the person possesses sufficient mind to understand in a reasonable manner the nature and effect of the act in which he is engaged. *English v. Porter*, 109 Ill. 285; *Bond v. Bond*, 7 Allen 1; *Wilkinson v. Sherman*, 45 N. J. Eq. 413 (18 Atl. Rep. 228); *Wright v. Jackson*, 59 Wis. 569 (18 N. W. Rep. 486).   It is also said that, "as a result of medical research, it is now well understood that a man may be thoroughly insane on one subject, and at the same time be capable of transacting business on all others." 16 Am. & Eng. Enc. Law (2d Ed.) 624.

We think it hardly possible that, applying these rules, any disinterested person can read the evidence in this case, and say that John Irwin was not "thoroughly insane" on the subject of property and taxation, or that he had sufficiently sound mind "to understand in a reasonable manner the nature and effect" of his conduct in reference to such matter.   In view of the long period that has elapsed since the tax sales upon which defendants' claim of title is based, and the possible hardships resulting to those whose intervening rights have been acquired without notice of the defect in such titles, we have been reluctant to reach this conclusion; but, without a palpable disregard of the clear and satisfactory preponderance of the evidence, we cannot do otherwise than say that the alleged insanity of John Irwin has been fairly established. It is useless, perhaps, to speculate upon the cause of this condition.   It is not an improbable theory that in his eagerness to acquire land he made the mistake of investing his entire capital in the large purchases made by him, and then, finding himself unable to meet the naturally large aggregate demand for taxes, the worry and anxiety

thus occasioned, and the fear of losing the land in which his fortune was locked up, may have produced the mental disorder which clouded all the rest of his life. It is a matter of common knowledge that the years immediately following 1856 were years of depression and discouragement, in which many men of property were put to sore trial. That insanity should in some cases follow such experience is not a matter of surprise. There is no direct evidence upon which this can be said to be true of Mr. Irwin, and it is mentioned only as a theory which the revealed facts of his history make plausible. We are not concerned, however, with the cause of his mental aberration. It is the fact of its existence which is material, and that, as we have said, is established by the evidence.

II. Concerning the insanity of John Irwin as alleged, do the decrees quieting defendants' title against his claims operate to conclude him or his heirs? The arguments of

2. VACATION of decree against insane person; guardianship. counsel are notable for the industry displayed in the marshaling of authorities, and the skill and ability with which they are presented for our consideration. If we were required to decide the dispute solely upon the precedents, or as a matter of right, independent of the statute, it would be by no means free from doubt and difficulty. It is unquestionably true, however, that from very early times the property rights of children and lunatics have been favored in law, and the courts have regarded such persons as their wards, whose interest should not be sacrificed to mere technicalities, or be allowed to suffer prejudice by reason of their helpless or irresponsible condition. Keeping that just and humane purpose in view, the legislature has attempted to provide certain and definite laws by which the rights of such wards may be preserved. Referring to the Code of 1873, which was in force at the time of the proceedings now being reviewed, we find that by sections 3154 to 3162 a means is provided to open up and vacate judgments erroneously

entered against a minor or person of unsound mind. But it is contended by appellees that the proceedings sought to be vacated in the present instance cannot be properly deemed erroneous, and therefore no relief can be granted plaintiff under the provisions referred to. It is conceded that Irwin did not appear to the suits to quiet title; that no guardian appeared for him, none was appointed to defend his interests, and his default was entered and the decrees taken without any cognizance of his alleged mental unsoundness. Appellees' theory is based upon section 2570 of the Code of 1873, which provides that "the defense of a person judicially found to be insane, or of one confined in any state hospital for the insane, who by the certificate of the physician in charge appears to be insane, must be by guardian," from which language it is argued that as the insanity of Irwin had not been judicially established, and he was not confined in any state hospital for the insane, there was no occasion for the appointment of a guardian to defend for him, and therefore no error in rendering the decree.

We cannot accept this as the correct construction of the statute. The section quoted provides, in effect, that a judicial finding of insanity, or the certificate of the physician in charge of a defendant confined in a state hospital, shall be taken as conclusive evidence of his mental irresponsibility, and that whenever such evidence is produced the court must require defense to be made by guardian. But suppose there has never been any judicial inquiry into a defendant's mental condition, and no confinement in hospital, but he is himself personally in the presence of the court, and it is apparent at a glance that he is a hopeless maniac or idiot; can it be that the court would be justified in ignoring the patent fact of such defendant's helplessness, and that a default and decree so rendered, devesting him of title in his estate, is not erroneous? If such a decree is open to question, is it less so

when rendered against one who is equally incapable of protecting his own right, but is not directly under the eye of the court? The letter of the law does not require, and its spirit forbids, any construction which works such manifest injustice. Indeed, it would seem that it is for just such cases as last supposed that this statute is more especially enacted. Where the fact of insanity is brought to the court's attention by reference to a judicial finding or physician's certificate, then the mental condition of the party, as well as the error in failing to require appearance by guardian, "appear in the record" (Code 1873, section 3154), and the correction must be by appeal. Where, however, the fact of insanity exists, but is not brought to the attention of the court, "and does not appear in the record," a judgment by default, in our opinion, involves error, within the meaning of the statute. *Wise v. Schloesser*, 111 Iowa, 16. In order for an insane or infant defendant to have the benefit of this statute, it is not necessary that the judgment from which relief is sought be void. A void judgment may be vacated or its enforcement enjoined by a suit in equity. The decrees obtained by the defendants quieting their title are not void. There was an error in their rendition, but no fatal lack of jurisdiction in the court. The statute simply provides a method by which that error may be corrected by the trial court, and a failure to demand such correction within proper time after the removal of the disability leaves the decrees unassailable. In our view, therefore, the heirs were entitled, upon proper showing made within the prescribed time after Irwin's death, to have the decrees vacated and a new trial ordered. The questions whether the proceedings therefor were begun in time remain to be considered.

III. It is the appellee's contention that neither the suits in equity to redeem from the tax sales, nor the pro-

ceedings for a new trial in the actions to quiet title, were
begun within the time prescribed by the stat-
ute for the exercise of such rights. Code
1873, section 892, provides that when the
"real estate of a minor or lunatic is sold for
taxes the same may be redeemed at any time
within one year after such disability is removed," and
section 893 further provides that, where a tax deed has
been delivered, the redemption shall be effected "by
equitable action in a court of record." In proceedings to
vacate a judgment or decree for erroneous proceedings
against a person of unsound mind, it is also provided (sec-
tion 3157) that such proceedings must be commenced
within one year after the judgment or decree was made,
"unless the party entitled thereto be a minor or person of
unsound mind, and then within one year from the removal
of the disability." Whether the heirs of John Irwin have
any standing in court in the several proceedings involved
in these appeals depends upon what shall be held to be a
beginning or commencement of such proceedings, within
the meaning of the statute. Section 2599 of the Code of
1873 reads as follows: "Actions in a court of record shall
be commenced by serving defendant with a notice," etc.,
while section 2532 is in the following language: "The de-
livery of the original notice to the sheriff of the proper
county with intent that it be served immediately, which
intent shall be presumed unless the contrary appears, or
the actual service of the notice by another person, is a
commencement of the action." Appellants' position is
that section 2532 controls, and that, the original notice in
each of the several cases having been delivered to the
sheriff of the proper county before the expiration of the
year allowed by the statute, the actions are to be consid-
ered as begun in due time, even though in some instances
actual service of notice was not obtained during the year.
Appellees take issue upon this proposition, and insist that,

3. TAX sale:
insane
owner: com-
mencement
of action to
redeem: ser-
vice of
notice.

while section 2532 will ordinarily control in the application of statutes limiting the time in which an action may be brought, cases like those before us constitute an exception to the rule, and, to entitle one to prosecute such proceedings, action must be begun, not by simply placing the notice in the sheriff's hands, but by actual service of such notice. In other words, that in this class of cases an action is not "commenced," within the meaning of the law, even to avoid the time limitation, until service of notice is obtained.

A majority of the court adopts the appellees' contention in this respect, and as it is conceded of record that, in three of the six cases before us (Nos. 497, 2,300, and 2,308), notice was not actually served within one year after Irwin's death, it is held that such proceedings are barred. In the other cases, service was obtained within one year after the death of Irwin. The theory upon which this conclusion is reached is as follows: That section 2532, being enacted in connection with the general statute of limitations, is to be held applicable only to causes of action at common law and to statutory rights of action, for which the statute creating them provides no special limitation. Stated in other words, if the statute creating a right of action provides in the same connection that the right shall be exercised within a certain named period, then the limitation inheres in the right, and it is unaffected by the rules pertaining to limitations generally. Applying that rule to the present case, it is found that the statute saving to the minor and lunatic their right to redeem, and the statute conferring the right to demand a new trial for erroneous proceedings against them, provide in each instance that such right shall be exercised within one year after the disability is removed. It follows, therefore, in obedience to the principle above stated, that the delivery of the notices to the sheriff is not to be held a commencement of the action. In support of this rule the

following authorities are relied upon:    *Miller Brewing Co. v. Capital Ins. Co.*, 111 Iowa, 590; *Parkyn v. Travis*, 50 Iowa, 436; *Proska v. McCormick*, 56 Iowa, 318; 13 Am. & Eng. Enc. Law (1st Ed.) 688, 690; *Palen v. Johnson*, 50 N. Y. 49; *Mewburn's Heirs v. Bass*, 82 Ala. 622 (2 South. Rep. 520); *Hudson v. Bishop*, (C. C.) 35 Fed. Rep. 820; *Bartlett v. Manor*, 146 Ind. 621 (45 N. E. Rep. 1060); *Taylor v. Coal Co.*, 94 N. C. 525; *Insurance Co. v. Hocking*, 130 Pa. St. 170 (18 Atl. Rep. 614); *McElroy v. Insurance Co.*, 48 Kan. Sup. 200 (29 Pac. Rep. 478); *The Harrisburg*, 119 U. S. 199 (7 Sup. Ct. Rep. 140, 30 L. Ed. 358).

I am unable to agree with the majority upon this proposition, and upon this proposition I am authorized to say that McClain, J., concurs in the opinion hereinafter expressed.

That many of the authorities do lay down the rule that where time is of the essence of the right created, and the limitation is an inherent part of the statute creating it, some of the principles applicable to general statutes of limitations do not apply, will be readily conceded. But there has not been cited, nor, with a single exception, have I been able to find, any precedent in the decisions of this court or elsewhere justifying, even by inference, the doctrine upon which we here place the stamp of our approval. The solitary exception above referred to is found in an opinion by Shiras, J., at *nisi prius*, in *Hintrager v. Nightingale*, (C. C.) 36 Fed. 847, and has been, as we shall hereinafter have occasion to note, expressly disapproved by this court upon the very point here involved. In my opinion, none of the authorities to which our attention is cited bear out the principles contended for. In *Parkyn v. Travis, supra*, the note upon which suit was brought was due April 2, 1878. The original notice was placed in the sheriff's hands a day or two before the note was due, but service was not made until the debt had fully matured; and, it being claimed by the

defendant that action had been premature1y brought, we
held that in such case the commencement of the suit
dated from the time of service.   It needs but little reflec-
tion to make plain that this precedent is not in point.
The notice was placed in the sheriff's hands before the
note was due,—before any right of action accrued,—and
this was sufficient to justify the presumption that imme-
diate service was not intended.   Generally speaking, every
right of action is limited by a statutory provision, general
or special, fixing a time beyond which the right is barred
or extinguished.   The purpose of section 2532 is to provide
a definite rule or standard, not for determining when the
defendant is brought under the jurisdiction of the court,
but when the plaintiff shall be held to have set the
machinery of the law in motion.   It is made particularly
for plaintiff's benefit.   The right begins with the right to
sue, and expires with the last day of the prescribed period.
Up to that instant the original notice may be placed in the
officer's hands for immediate service, and the action is
then so far begun that if service be thereafter completed
the time limitation will not avail the defendant.   Before
section 2532 can be applied in any case, a right of action
must exist, and its only effect, when available, is to pre-
vent the running of the statute against that right.   The
*Parkyn Case* in no manner called for an application of
the statute of limitations, and the section referred to was
very properly held to have no effect upon the rights of the
parties thereto.   In *Proska v. McCormick*, action was
brought upon a written contract which provided that, if
suit should not be begun by a certain date, its condition
should be "acknowledged fulfilled." ' Original notice was
delivered to the sheriff before, but not served till after,
the date named, and we there held that section 2532 was
applicable only to statutory limitations, and not to limita-
tions by contract; a holding which comes far short of the
the proposition in support of which it is cited.   The cita-

tion from the Encyclopædia of Law is based upon cases, mostly from the federal courts, which hold, in substance, that the expiration of a special limitation upon a statutory right of action operates to extinguish the right, as well as to bar the remedy, in a foreign jurisdiction as well as in the jurisdiction of its origin. Surely there is nothing in these authorities of such persuasive force or bearing as to require the overruling of our decisions, or the reading into the statute of exceptions and qualifications which the legislature did not see fit to express. Section 2532 of the Code of 1873, identical with the present Code (section 3450), is but a re-enactment of a rule which was already the recognized law of the land. "It is undoubtedly the general rule in the United States, except where otherwise provided by statute, that an action is deemed commenced, so far as the parties to it are concerned, from the time the summons or other process is issued and delivered, or put in the course of delivery, to the officer, with the *bona fide* intent to have it served." Freeman's note to *Ross v. Luther*, 15 Am. Dec. 341. See, also, *Ford v. Phillips*, 1 Pick. 202; *Burdick v. Green*, 18 Johns. 14; *Johnson v. Smith*, 2 Burrows, 950; *Hayden v. Bucklin*, 9 Paige, 512; Wood, Limitations, section 289; Angell Limitations (6th Ed.) section 312.

It was competent for the legislature to adopt this prevailing rule, or to declare what other act or step in the origination of legal proceedings should be deemed a "commencement" within due time. It chose to preserve as nearly as practicable the established practice, and declared in unequivocal terms that, whenever the original notice is delivered to the sheriff for immediate service, the action is commenced. The language is broad and general, without mention of any exception. The mere fact that the provision is found in connection with the general statute of limitations does not affect its application to every time limitation, general or special, for the com-

mencement of actions. *Smith v. Callanan*, 103 Iowa, 224; *Snyder v. Ives*, 42 Iowa, 157. We have distinctly so decided. For instance, sections 3154 and 3156 of the Code of 1873 provided a remedy by which a judgment or decree could be vacated or modified on account of any mistake, neglect, or omission of the clerk, and limited the time within which such remedy could be demanded to one year. This, be it remembered, is a section of the same statute under which the plaintiffs in the cases before us are asking to open up the decrees against John Irwin. It is not found in the title or chapter pertaining to the statute of limitations, and the right conferred is strictly statutory, yet in the case last cited we held that not only section 2532 was applicable to such proceeding, but, upon a record which affirmatively showed that service of the notice was not made until after the year had expired, we would presume that such notice had been delivered to the sheriff within the period of limitation. If any doubt can arise as to the sufficiency of that authority, there is certainly room for none with reference to *Smith v. Callanan, supra.* That was an action brought to redeem land from tax sales, and involved an application of section 902, which provided that "no action for the recovery of real property sold for the non-payment of taxes shall lie unless the same be brought within five years after the treasurer's deed is executed and recorded." There, as in the present case, the notice was delivered to the sheriff before the expiration of the period, but was not served until the limit had passed; and there, as now, the point was made that section 2532 was inapplicable, and that section 2599 must govern the rights of the parties. After a general review of the cases and the statute, we said: "It is clear that section 2599 throws no light upon the subject of our inquiry. That section simply points out when an action is commenced. Section 2605 is only material as indicating the officer's duty as to service, but, like section 2532,

is not in terms limited to chapter 2 of title 17 of the Code of 1873. We then have but one section which undertakes to provide what shall be deemed to be a commencement of an action, so far as the statute of limitations is concerned, and that section is 2532." After a reference to the precedents, we further said: "We have referred to the foregoing cases, not because they were decisive of the question before us, but rather to show the tendency of judicial construction, and as indicating to some extent the view this court has taken as to whether section 2532 is controlling in determining what is the commencement of an action when the limitation is the special one not found in the general chapter on Limitation of Actions. It is apparent that in one or two cases the court, without deciding that section 2532 was applicable in all cases where special limitations are provided, has applied it in such cases. We do not think that the mere fact that section 2532 is found in the general chapter on Limitation of Actions is of itself controlling in determining whether it shall be applied to other cases found in the Code, and especially as it is, in its terms, general and unrestricted." Referring then to the *Hintrager Case*, above mentioned, we held, in substance, that the opinion of Shiras, J., was evidently based upon a misconception of our holding in *Proska v. Mc-Cormick*, and refused to recognize its authority, and added: "Certain it is, the same rule should obtain as to what shall constitute the commencement of an action as to the statute of limitations, whether limitation be found in the general chapter, or elsewhere in the Code, unless there is something in the statute itself indicating to the contrary, or unless some recognized rule of construction will be violated in so holding." We accordingly decided that the action had been brought in due time. The decision we now promulgate not only overrules the conclusion there reached, but is, as well, a repudiation of the entire line of reasoning which then had our unanimous approval.

To say this is not the case is to indulge in a refinement of distinction which inevitably tends to involve the rules of legal practice in obscurity and doubt. I believe we should uphold the statute according to its clear and unequivocal language, and that each and all of the several proceedings embraced in these appeals should be held to have been begun in proper time for a hearing upon the merits.

Under the ruling of the majority, the decrees of the district court in causes numbered 497, 572, 2,300, and 2,308 are affirmed. Other decrees embraced in these appeals are reversed, and cases ordered remanded for further proceedings not inconsistent with the conclusions above announced.—AFFIRMED in part, and REVERSED in part.

BISHOP, J. (concurring).—I am satisfied with the result as announced in the foregoing opinion of Weaver J. I share, however, in the views entertained by the majority of the court upon the question presented in the third sub-division of the opinion, and, as the position of the majority is not clearly set forth therein, it seems to me appropriate that a brief statement defining the same should accompany the opinion.

It will be observed that the propositions involved are what shall be considered the commencement of an equitable action, within the meaning of section 893, of the Code of 1873, and what shall be deemed the commencement of proceedings, within the meaning of section 3157 of the same Code. If section 893 and section 892, preceding it, are to be taken as statutes of limitation, simply, then, unquestionably, section 2532, Code 1873, has application, and the equitable action provided for must be held to be commenced when the original notice is placed in the hands of the sheriff with intent that the same be served immediately. On the other hand, if not statutes of limitation, simply, then section 2532 has no application, and the action must be regarded as commenced only when the

notice has been actually served upon the defendant as
provided in section 2599, Code 1873. It seems very clear
that the section last referred to was intended to define
what should constitute the commencement of an action,
in the broad and general sense, and that it has application
to all cases where the question of the actual pendency of
an action arises. It occurs in the Code in connection with
the general subject of the commencement of actions, and,
without question, would govern in all cases unless excep-
tion is provided for by some further statutory enact-
ment. Section 2532 clearly furnishes such an exception.
It is found in connection with the provisions of the statute
relating to limitation of actions, and, under a familiar
rule of construction, must be confined in its operation
thereto unless it appears by necessary implication that it
was intended to have a broader scope or more extended
application. That it may have application to limitation
statutes other than those found in the general chapter re-
lating to that subject, and that it may be invoked in those
cases where a limitation upon the right to commence an
action is provided for by contract, may readily be con-
ceded, but no sufficient reason appears for permitting a
further encroachment upon the general rule as provided
for in section 2599. The reason for the rule of section
2532 is apparent upon a moment's reflection, and that such
reason in no sense entered into the enactment of section
2599 is equally apparent. Statutes of limitation, it will
be borne in mind, relate exclusively to the remedies
afforded by the law, and the effect thereof when inter-
posed, is simply to create a barrier to a further prosecution
of the suit. The right of action, considered by itself, is
not involved in respect of any of its essential elements.
It follows that the interposition of a plea of the statute of
limitations gives rise to no implication to the effect that
the cause of action alleged is not otherwise meritorious,
or that it has been paid, or in some other manner satisfied.

The sole thought underlying all statutes of limitation is that public policy will be subserved by forbidding the prosecution of stale demands. Such statutes are accordingly properly denominated "statutes of repose." Where, however, the purpose of a statute is to grant a legal right that otherwise would have no existence, and such grant of right is, by the terms of the statute, conditioned upon its acceptance or the exercise of the right within a stated period, then an altogether different principle is involved. Such a statute is not bottomed upon a like reason, nor has it any of the characteristics of a statute of limitation, inasmuch as in such cases the time limit inheres in and forms a part of the right itself. In other words the essential property right granted by the statute is made to depend for its existence upon demand being made therefor within a certain prescribed period. And it can make no difference whether the demand is to be made upon some particular person or officer, or by way of an action brought in a court of competent jurisdiction. In either event the demand must be made, or the action commenced, in order that the property right may be said to have become fully matured.

Under the provisions of the statutes in question, a right of redemption from tax sale is conferred upon minors and lunatics, conditioned upon the exercise of such right within a prescribed period of time after the disability of minority or lunacy, as the case may be, has been removed. Here the limitation of time is an inherent part of the right created, and the statute was in no sense designed as a statute of limitation, going to the remedy only, or having for its sole object the fixing of a period within which an action might be brought. The right granted by the statute is to redeem within a certain period of time, and the power and its exercise within the time limited are each essential parts of the right conferred, so that there is no right of action independent of the limitation. *Proska v.*

*McCormick*, 56 Iowa, 318, was an action upon a penal bond which contained a provision that it should be deemed fulfilled unless action be brought thereon within a certain fixed period; and we held that, as applied thereto, action was not commenced until the notice thereof was in fact served. In that case we said: "It is necessary at the outset to distinguish carefully the difference between pure statutes of limitation and other special limitations which are similar, but have widely different qualities. Where time is of the essence of the right created, and the limitation is an inherent part of the statute or agreement under which the right in question arises, so that there is no right of action independent of the limitation, a number of leading principles which apply to pure statutes of limitation, are inapplicable." In the case of a pure statute of limitation, as we have seen, there is no connection between the right upon which an action is predicated, and the statute which forbids the prosecution of such action solely on the ground of the lapse of time. The right of action may be conferred by statute, or it may rest upon some principle of the common law. The limitation denying the aid of the courts for the protection or enforcement of such right of action is a creation of the statute, pure and simple. The case of *Proska v. McCormick* is clearly an authority for the proposition that as between an essential right of action, and a limitation upon the right to invoke the aid of the courts to enforce the same, a clear distinction exists, and different principles are applicable to each proposition. And there certainly is no justification, in reason, for saying that, in a case where the right of action itself has for one of its constituent elements a condition that it shall be asserted or exercised within a given period of time, the right can be separated, and one part governed by one set of principles, and the other part by a set of principles applicable to an entirely different.

subject. See cases in support of our position cited by Weaver, J. It may be conceded that the case of *Hintrager v. Nightingale* (C. C.) 36 Fed. Rep. 847, is not in all respects in harmony with our holding in *Smith v. Callanan*, 103 Iowa, 224. But our position is in no sense disturbed thereby. The *Callanan Case* involved an application of section 902, Code 1873, which provided that "no action for the recovery of real property sold for the non-payment of taxes shall lie, unless the same shall be brought within five years after the treasurer's deed is executed and recorded." Such statute relates to the subject of remedy, and to that alone. It is in its every essential feature a statute of limitation, and is to be construed in the light of those principles which govern in the case of pure statutes of limitation. The case is in no sense, therefore, an authority upon the question we have before us. The reasoning upon which we base our conclusion in respect to sections 892 and 893 applies equally to section 3157. As opposed to this, Weaver, J., cites and relies upon the case of *Snyder v. Ives*, 42 Iowa, 157. That was an action in equity to correct the mistake of the clerk, whereby he had left out of the decree in an action for the foreclosure of a mortgage the description of a portion of the real estate covered by the mortgage. It was not in any sense a proceeding under chapter 1, title 19, of the Code. Had it been, section 3156 alone would have been applicable. That section provides that proceedings to correct a mistake or omission of the clerk shall be by motion served on the adverse party or his attorney within one year. The action being in equity, the plaintiff, upon a proper showing, was entitled to relief as in equity, and this without reference to the time limit as fixed in section 3156. Such was the distinct holding in *Partridge v. Harrow*, 27 Iowa, 96. It is true that the opinion in *Snyder v. Ives* contains dicta upon which an argument might be based leading to the conclusion that sections 3156, 3157, Code

1873, and the corresponding sections in the present Code, were intended as statutes of limitation. In·this we do not agree. In the sections referred to, the time limit is an inherent part of the right granted, and in connection with proceedings thereunder the provisions of section 2532, Code 1873, and the corresponding section in the present Code, have no application.

DEEMER, J.—I concur with Judge Bishop in the views above expressed.

SUPPLEMENTAL OPINION, OCTOBER 31, 1903.

Supplemental opinion on rehearing.—*Denied.*

PER CURIAM.—Plaintiffs' counsel, in an able and exhaustive petition for a rehearing, challenge the positions taken by the majority of the court on a former hearing, and ask for a modification of the conclusions reached on that hearing, in any event, because of an alleged misapprehension of the facts.

Turning again to the abstracts, which are very voluminous, we find that case No. 2,300 was an action brought by plaintiffs, Hawley *et al.*, against Griffin *et al*, to redeem from tax sales; and that No. 572 was originally an action brought by Griffin *et al.* against John Irwin *et al.*, to quiet title to certain of the lands in controversy, in which plaintiffs herein filed petitions to vacate the·decree rendered therein, and for a new trial, under section 3154 *et seq.* of the Code of 1873. In this last case notice was actually served upon defendants within one year from the death of Irwin, and under the doctrine announced by the majority the holding of the trial court in that case should have been reversed. But the question as to the effect of the reversal of that case remains to be considered. Counsel concede that the application therein was to vacate the decree quieting title in the Griffins, and for a new trial of that·action; and the claims heretofore· made have.. been,

not that the petition to vacate the decree in No. 572 amounted to an action for equitable redemption under sections 892 and 893 of the Code, but that by reason of these petitions for vacation, the decree in the action to quiet title brought by Griffin against John Irwin et al., should not be regarded as conclusive against them. The cases were tried together, under a stipulation that the petitions for new trial should first be determined; but there was no agreement that the decision in No. 2,300 should depend in any way upon the conclusion reached in No. 572. Case No. 2,300 was an action to redeem from tax sales brought by the heirs of John Irwin, deceased. In this action Griffin et al., filed answers, which included counterclaims, asking that, in the event plaintiffs were denied redemption, their title to the premises be quieted in them. Manifestly, this case No. 2,300 must be affirmed under the rule announced by the majority in the original opinion, and it follows that defendants in No. 2,300 are entitled to a decree quieting their title in and to the lands described in their cross-petitions. It not only appears from the pleadings filed in the case and the concessions of counsel that the petition filed in No. 572 was to vacate the judgment and decree rendered therein, and for a new trial of the original action, but the cases were tried on the theory that No. 2,300 was the action to redeem, and that the petition was filed in No. 572 to get rid of the decree rendered therein. This being true, the reversal of No. 572, which should have been ordered in the original opinion, will do the plaintiffs no good, for since the filing of the petition therein their affirmative rights have been extinguished by lapse of time.

If No. 572 had been an equitable action, as was *Snyder v. Ives*, 42 Iowa, 157, relied upon by plaintiffs' counsel, it may be that, having gone into a court of equity, that court would retain jurisdiction to the end, to afford complete relief to the parties. But counsel concede that

it is not. It is in truth an action by ordinary proceedings
**4. VACATING decree to quiet title: insane owner: procedure.** to vacate a judgment under the provisions of the statute before referred to. There is a manifest distinction between such a proceeding and an action in equity in the nature of a bill of review. One is governed by the conditions and limitations contained in the statute, and the other by the ordinary rules of procedure. *Denby v. Fie*, 106 Iowa, 299; *Manning v. Nelson*, 107 Iowa, 34. That an action in equity will lie in such cases, see *Bowen v. Mill Co.*, 31 Iowa, 460; *Clark v. Ellsworth*, 84 Iowa, 525; *Bond v. Epley*, 48 Iowa, 600. The extent of the jurisdiction is to grant relief on the grounds stated in the Code, but the methods of procedure are different, as will appear from a review of the cases cited. This distinction was pointed out in the original majority opinion, in referring to the *Snyder-Ives Case*, but was not emphasized to any great extent.

What, then, is the purpose and effect of proceedings under the sections of the Code to which we have referred? Section 3154 of the Code of 1873 provides that the court **5. VACATING decree: defense: counterclaim.** may, after the term at which a judgment is rendered, vacate or modify the same or grant a new trial. Section 3159 of the same Code provides that the judgment shall not be vacated until it is adjudged there is a valid defense to the action in which the judgment was rendered; and section 3162 provides that, if the judgment is affirmed, an additional judgment for costs shall be rendered against plaintiff in error. We thus see that the proceedings are to vacate or modify a judgment or order, or to grant a new trial in a case where there is a valid defense to the action, for some of the grounds enumerated in the statute; and, if a new trial is awarded, it is for the purpose of allowing the defeated party to establish his cause of action if he be plaintiff, or to sustain his defense if he be the defendant. The statute does not contemplate the introduction of a new cause of

action by a plaintiff, nor of a counterclaim by the defendant. The defendant, if granted a new trial, has the right to interpose any defense he may have had to plaintiff's cause of action, but is not awarded the new trial to enable him to interpose a counterclaim or cross-demand. This he may do in a new action; and, unless he has a defense to plaintiff's cause of action, he cannot avail himself of this remedy. This much seems clear.

Now, the reason for granting the heirs of Irwin a vacation or modification of the decree quieting title in Griffin was because Irwin was insane when the action was 6. VACATION of brought against him and when the case came decree by heirs: right on for trial, and he did not appear by guardto redeem as defense. ian, nor was a guardian *ad litem* appointed for him. The only defense he could have interposed to the action, even if a guardian of either kind had been appointed, was that he was insane when his lands were assessed for taxation and sold for nonpayment of taxes, and that he had a year after his disability was removed within which to redeem. This would doubtless have been a defense to Griffin's action to quiet title; and, when the decree quieting title was vacated, the case stood as an action to quiet Griffin's title to the lands based on tax deeds, and a defense to it that Irwin was insane at the times mentioned. No guardian was ever appointed for Irwin in his lifetime, and Griffin, with the case standing in the position we have stated, might have elected to dismiss his suit to quiet title after the vacation of his former decree. He was not required to prosecute it after the original decree had been vacated. But, suppose he had elected to proceed, with Irwin still alive, but insane. He would doubtless have asked for the appointment of a guardian *ad litem*, and such a guardian would have answered, setting up Irwin's insanity, and asking that his rights be protected. This guardian *ad litem* could not have redeemed, for he would have had no money with which to

do it; and he would not have asked to do so, because he should know that the statute gave the insane defendant one year from the time his disability was removed within which to make redemption. It is very clear, then, that, had John Irwin lived, and secured a vacation of the decree quieting Griffin's title, this would have been the situation. How, then, did his death change it, if at all? His heirs, as successors to his rights, might have interposed the same defenses he could have interposed; and as his successors they can interpose no other. In order to secure the vacation, they must show that John Irwin had a defense to Griffin's cause of action. Without this showing they could not be heard to question the decree rendered in No. 572. Having secured the vacation on this theory, they are entitled to no greater rights by reason of the vacation than Irwin himself would have had had he been properly represented in the original action. Moreover, Griffin, as we have said, had the right to discontinue his action after the vacation of the decree, had he seen fit; and Irwin's heirs could not, by reason of the acquisition of a right of redemption long after the original decree was rendered, insist on the case remaining in court for the assertion of rights accruing to them under another statute entirely independent of anything connected with the original litigation. In other words, their right of redemption was not a defense John Irwin might have interposed to Griffin's cause of action in his case to quiet title. This came to them in virtue of a statute which limits their rights and fixes the nature of the action. We mean sections 892 and 893 of the Code of 1873, referred to in the original opinion of the majority. Had Irwin's heirs brought independent actions to set aside the original decree in case No. 572, and for permission to redeem under sections 892 and 893, instead of proceeding under section 3154 *et seq.*, of the Code, it may be that a court of equity would have granted them relief; but such action should have been·

brought under sections 892 and 893 of the Code, and, unless commenced within one year, they would have had no standing in court. Case No.'2,300 was an equitable action to redeem, and in that action they virtually asked that the decree in 572 be set aside, and they given permission to redeem, but that action was not commenced in time. The proceedings in 572 were simply to get rid of a decree quieting title in Griffin, and, while they asked for some other relief, which could not have been granted in that form of action—for instance, the bringing in of new parties, the substitution of others, and some other matters —it is conceded that the action was brought under section 3154 *et seq.* of the Code of 1873.

But let us assume that they could have interposed their independent right of redemption because of the insanity of John Irwin. This could only be done by counterclaim in the main suit of Griffin v. John Irwin, after the substitution of some parties and the introduction of others. Such relief would not have been a defense to Griffin's cause of action to quiet title. It would be purely affirmative, and could only be granted on cross-petition. Until the original decree was vacated, and necessary parties brought into the original suit, this counterclaim had no place in the litigation. It was not defensive. Hence this counterclaim could not be considered until after the decree was vacated under section 3154 of the Code. At that time lapse of time had extinguished their right to redeem, and the counterclaim could not have been considered. No matter what the aspect of the case, it is manifest that plaintiffs herein cannot claim any benefit from their proceeding to vacate and modify the decrees quieting title, except in those cases where they brought their actions to redeem within the time limit prescribed in section 892 of the Code. The order on the petition to vacate the decree in No. 572 will be reversed, but the decree in No. 2,300 must stand affirmed.

The unusually able and exhaustive petitions for rehearing seem to call for some further observations from the majority of the court regarding some phases of the case. Counsel say that under the opinion as it is written an insane person labors under greater difficulties than one who is sane, because, if a sane person had brought suit under section 893 of the Code of 1873, he would be held to have commenced his action when the original notice was delivered to the sheriff for service. This is no doubt true, and for the very good reason that the only time statute with reference to such actions is a pure statute of limitations, as held in *Smith v. Callanan,*103 Iowa, 224, whereas, if an insane person commences action under sections 892 and 893 of the ·Code, his action is held not commenced until actual service of notice, as held in this case. This is also true, and the reason for so holding appears in the foregoing majority opinion. The statute conferring this right on an insane person or his representatives has as its inducement a time limit, which enters into and controls the right. The insane person or his representative is given one full year, not possessed by sane persons, and the legislature in its wisdom no doubt thought this was ample time within which this leniency should be exercised. The right is purely statutory—that is, it did not exist at common law; and, as the statute conferring the right contains its own limitation, this limitation inheres in the right and controls it. It is similar to a contract limitation, which we have held does not bar the remedy, but extinguishes the right. *Farmers' Co-operative Creamery v. State Ins. Co.,* 112 Iowa, 608; *Harrison v. Ins. Co.,* 102 Iowa, 115. The supposed inequalities of this construction of the statute are more apparent than real. It must constantly be borne in mind that the insane person or his representatives are given one year more than a sane one in any event, and in some cases this period may amount to many years within which they may bring their actions to redeem. The legis-

lature saw fit to grant this leniency, which did not, as we have already observed, exist at common law; but so limited it in the enacting clause that time became of the essence of the right; and, unless this privilege is exercised within the time named, it is forever lost.

Plaintiffs, recognizing the force of *Proska v. McCormack*, 56 Iowa, 318, and *Parkyn v. Travis*, 50 Iowa, 436, and other like cases, contend, however, that, while the majority might have been right had the limitation been a contract one, vigorously contend that they are all wrong in applying the rules there announced to a statutory limitation. If this were a pure statute of limitations, there would be no doubt of their position. But it is not. We have attempted to show that time is expressly made of the essence of the right created, and it is just as binding and effective as if there had been a contract between the parties embodying the same terms. The difficulty lies in failing to distinguish between the two.

The majority have already distinguished the *Snyder-Ives Case*, and we need only add that a re-examination of that case shows that it was not a proceeding under section 3154 *et seq.*, but an independent action in equity. Indeed, the court, in its opinion, expressly says that it does not decide whether section 3156 was applicable to the case in any respect. Hence all that was said about proceedings under that section is pure *dictum*. The facts recited show beyond all question that it was not an application under section 3154. Moreover, section 3156 expressly provides that proceedings to correct mistakes of the clerk—which was the cause of action in that case—shall be by motion served on the adverse party, and within one year. See *Bond v. Epley*, 48 Iowa, 600. Even should we hold that *Snyder v. Ives* is an authority for plaintiff's contention, it would not avail them, for, as we have seen, their proceedings to vacate will not give them the right to redeem in virtue of an entirely independent statute conferring that privilege.

Many of the sections found in chapter 2, title 18, of the Code of 1897, which is a virtual reprint of the Code of 1873, are held applicable.to pure statutes of limitation, and to nothing else. *Carrier v. R. R.*, 79 Iowa, 80; *Sweatt v. Faville*, 23 Iowa, 321; *Wilson v. McElroy*, 83 Iowa, 593; *Fritz v. Fritz*, 93 Iowa, 27; *Fisher v. Shropshire*, 147 U. S. 133 (13 Supp. Ct. Rep. 201, 37 L. Ed. 109); *Harrison v. Hartford Fire Ins. Co.*, 102 Iowa, 112. The whole chapter has reference to limitation of actions, and not to time limits which inhere in the cause of action either by contract or by statute, and there is, to our minds, no difference between the two.

We have gone over the entire record again with care, and the majority reach the conclusion that case No. 572 should be reversed, instead of affirmed, and that No. 2,300 should be affirmed, as originally announced, and the original opinion will be modified to this extent and otherwise adhered to.

The petitions for rehearing will therefore be overruled. —OVERRULED.

WEAVER, J. (dissenting).—We have heretofore determined that John Irwin was insane from a date prior to the sale of the land for taxes to the time of his death, and that the decree quieting the tax title in Griffin was irregular and voidable. The supplementary opinion concedes that Irwin's representatives had the right to appear within one year after his death, and have the decree set aside, and make defense against Griffin's claim, and that such appearance was in fact made in due time. Notwithstanding all these findings, and notwithstanding it declares for a reversal of the order of the district court denying a new trial, the opinion proceeds to announce that the reversal is merely an idle form, which "can do the appellants no good." This anomalous result is sought to be justified upon the theory that the only right which Irwin or his

heirs could obtain by a new trial is a right to defend against the claim of Griffin, and that the right to have a redemption decreed in their favor is not a "defense," but a cross-demand for affirmative relief, and, furthermore, as the right to redeem by an independent action in equity has since become barred by the statutory limitation, the tax title is now unassailable.  If this be so, why do we reverse the order of the district court?  If the tax title is impregnable, then the heirs have no shadow of defense to Griffin's claim.   Their only right to be heard is upon the theory that their equity of redempion has never been cut off, and when we reverse the order denying them that right we say, in effect, that the door of the court is now open for them to establish the alleged invalidity of the Griffin title, and redeem from the sale.  We can find them entitled to a new trial only on the theory that they have made at least a *prima facie* showing of good defense; and when, in the same breath with this adjudication we declare that no defense exists, and that the privilege we offer these parties to be heard is barren of all possible benefit to them, we involve ourselves, it seems to me, in a hopeless paradox.   But, if we waive the apparent inconsistency of the result announced in the supplemental opinion, there still remain the following sufficient grounds of dissent therefrom:

I.   The proposition that the right to defend against Griffin's assertion of title does not include the right to demand and enforce a redemption from the tax lien is, in my judgment, untenable.   Griffin's action to quiet his title is brought in a court of equity.  A "defense" in equity is not limited to the narrow sense in which that word is used in tendering an issue at law.  It is not restricted to a mere denial, which puts plaintiff upon his proof, or to the pleading of new matter, which merely negatives his right of recovery.  It includes as well the right to set forth by way of cross-bill or answer any fact

or facts relevant to the case made by plaintiff upon which affirmative relief may be obtained by defendant, and the entire controversy between the parties be fully determined and settled. When, therefore, the heirs of Irwin demand and are granted the right to defend the action brought by the latter, they become entitled not only to deny the validity of the tax title he seeks to quiet, but to plead affirmatively the facts which establish their right to redeem, and have that right established and enforced in the same action. That a cross-bill alleging matters directly negativing the equity of the original bill and asking affirmative relief is a defensive pleading has been recognized by the courts for many years. A cross-bill "is considered a defense to the original action." 1 Bouvier, Law Dictionary, 481. "A cross-bill is nothing more than an addition to the answer. It makes a part of the pleading which states the defense; the answer being the other part." *Canant v. Mappin*, 20 Ga. 731. "A cross-bill, *ex vi terminorum*, implies a bill brought by defendant in a suit against the plaintiff respecting the matter in question in that bill, and it is a weapon of defense in such case." Cooper's Equity Pleading, 85. To same effect, see Story's Equity Pleading (9th Ed.) 393, 399; Mitford and Tyler, Pleading and Practice, 179; Peterbaugh's Pleading & Practice (3d Ed.) 363, 365; Adam's Equity (7th Am. Ed.) 403; Beach, Modern Equity Practice, 332, 333; Barton's Chancery Practice, 301; *Galatian v. Erwin*, Hopk. Ch. 66; *Allen v. Fury*, 53 N. J. Ch. 35 (30 Atl. Rep. 551); *Thurston v. B. S. G. Co.*, (C. C.) 86 Fed. Rep. 484; *Griffin v. Griffin*, 112 Mich. 87 (70 N. W. Rep. 423); *Nelson v. Dunn*, 15 Ala. 513; *Andrews v. Hobson's Adm'r*, 23 Ala. 239; *Andrews v. Kibbee*, 12 Mich. 96 (83 Am. Dec. 766); *Kirkpatrick v. Corning*, 39 N. J. Eq. 136; *Giler v. Felhour*, 45 Miss. 631; *Draper v. Gordon*, 4 Sandf. Ch. 210. In *Slason v. Wright*, 14 Vt. 208, Redfield, J., says the nature of a cross-bill is "strictly defensive to the original bill." I find the con-

trary doctrine nowhere suggested or upheld. Indeed, as I read the cases, this court has long been committed to the same rule. In *Treier v. Shafer*, 18 Iowa, 29, Dillon, J., says: "Under the former equity practice, a cross-bill proper was a defensive proceeding as 'an instrument of defense for the defendant in the original suit' "; and proceeds to explain that under our Code practice the matter which was before pleadable only by cross-bill may be alleged by way of answer, and affirmative relief granted thereon.

Unless we are to abandon this rule, and put ourselves out of harmony with all the precedents, we must hold that Irwin's heirs, having appeared within the year prescribed by statute, thereby acquired the right to present and urge every defense they had, whether legal or equitable, to Griffin's claim, and to receive such affirmative relief as the facts constituting their defense entitle them to in a court of equity.

II.  Thus far I have dwelt upon the general rule applicable alike to all equitable actions, and now call attention to the peculiar force with which it applies to actions to quiet title. The very object and purpose of an action of this kind under our statute is to bring into court for final adjudication and settlement all the conflicting claims of the parties plaintiff and defendant to the title to the property in question. It is a necessary allegation in every bill or petition for such relief that the defendant makes claim to the property adverse to the plaintiff, and when once brought into court he is imperatively required to plead any and all his claims thereto, or forever after to hold his peace. The action does not permit him to defend by pointing out the defects in plaintiff's title and withhold his own equities for litigation in some other proceeding. He, as well as plaintiff, must disclose all his claims, and, the court having the entire case before it, will declare the title according to the very right, attaching such conditions concerning the discharge of liens and incumbrances,

if any, as shall appear to be just.   It was, therefore, not
only the right, but the duty, of the heirs of Irwin, if they
would contest Griffin's claim of title, to plead all the facts
relied upon by them, and, while offering to do equity by
making repayment of the taxes, demand that they be ad-
judged the holders of the true title to the land.   This they
did in their application for a new trial and in their show-
ing of defense, and I have yet to find any authority in the
statute or in the general principles governing pleading
and practice in our courts which permits us to deny them
the benefits of the defense thus proffered.   As already
noted, it is of the very essence of equity jurisdiction that
the parties are not held to the narrow measure of allega-
tion which prevails at law, and the court, having obtained
jurisdiction of the parties and subject-matter, will take
cognizance of all their conflicting claims of right concern-
ing it, and, having weighed their equities one against the
other, enter a decree which shall fully and finally settle
the controversy, and put an end to litigation.   *Cockrell v.
Warner*, 14 Ark. 350; *Cathcart v. Robinson*, 5 Pet. 279 (8
L. Ed. 120); *Ord v. McKee*, 5 Cal. 515; *Wilson v. Lassen*,
5 Cal. 114; Merwin's Equity. Pleading, 537, 538; Aldrich,
Equity Pleading, 106.   To that end, the court will not
wait the initiative of the parties, but, if it becomes appar-
ent on the trial that there are outstanding claims held by
either party, and not pleaded, which may be the subject
of further controversy, will order the filing of cross-bill or
other necessary pleading, in order that the beneficent
purposes of equity may not be defeated.   *Field v.
Schieffelin*, 7 Johns. Ch. 150, (11 Am. Dec. 44.)   Even
without a cross-bill, in cases where the whole matter is
before it, the court will see that a defendant is not de-
prived of any substantial right by a decree in the existing
suit.   *Hudnit v. Nash*, 16 N. J. Eq. 555; *Lloyd v. Kirk-
wood*, 112 Ill. 338; *Tate v. Vance*, 27 Grat. 574; *Taylor v.*

*Beale*, 4 Grat. 99; *Wilson v. Madison*, 55 Cal. 5; *Miller v. Luco*, 80 Cal. 257 (22 Pac. Rep. 195).

III.   By our Code, a defendant may set up as many defenses, legal and equitable, as he may have to the plaintiff's claim.   Code 1897, section 3457.   By the Code even a counterclaim is classed as a defense.   See section 3457.   The right to defend is certainly broad enough to admit the pleading of everything which is admissible in an answer, and we have held that a counterclaim is an answer, and, "in a sense, a defense."   *Town v. Bringolf*, 47 Iowa, 133; *Yarger v. R. R.*, 78 Iowa, 652.   If the claim affect the subject-matter of the original bill, the "test of an equitable defense is whether, upon the same facts presented by a bill in chancery, the court would have entertained the cause and grant the relief sought."   *Gates v. Smith*, 2 Minn. 30 (Gil. 21).   Surely, under this rule, the pleading by the heirs of Irwin of the invalidity of the tax title, and their demand to be allowed to redeem from the tax sale, constitutes an equitable defense, and as such their right to plead and rely upon it is guaranteed by the statute as well as by the established principles of pleading and practice in courts of equity.   It was not necessary for them to plead by way of formal cross-bill, for under our statute all matters formerly pleaded only by cross-bill of defendant against plaintiff may now be alleged by way of answer, while the term "cross-bill" has come in ordinary use to signify a pleading filed by a defendant against a co-defendant.   *Treiver v. Shaffer*, *supra*.   The right to answer being once granted, it is not within the province of the court to say it shall not be exercised to the full liberal limit fixed by the statute.

IV.   The rights of the parties are to be considered and preserved as of the date of the service of the notice upon Griffin.   It was, to be sure, the last day of the year of grace allowed by the statute; but that fact in no manner detracts from the strength of their position.   They

had the right to proceed in equity to have the tax deed declared void, and to redeem from the sale. A suit in equity involving that title being already in court by the procurement of the adverse holder, they could appear therein, and, having obtained a vacation of the decree, set up their equities against his, and have the same fully and finally adjudicated. Possibly they could also have proceeded by independent action in equity for redemption under Code, section 1440 (Code 1873, section 893), though I regard it open to doubt whether the default decree, if left unassailed by direct proceedings, would not have been held to be a bar to redemption by the latter method. They attempted, however, to get into court by both methods—by action in equity and by appearance to defend in the action brought by Griffin. In the former, according to a majority holding of this court, they failed to serve notice in time, and were barred by the limitation of the statute; but in the latter the service was timely. Thus they are in court, and are assuredly now clothed with every right to resist the tax title which they possessed at the moment the notice was served. If not, in what manner have they lost it? The notice put a stop to the running of the statute, and the erroneous ruling of the district court in refusing them the right to be heard was promptly appealed from to this court. Can it be said that, because the right to begin an independent suit in equity has been barred since the heirs obtained a standing in the action brought by the tax-title holder, such bar becomes operative to cut out the defense to Griffin's claim? If not, then on what ground can we justify the conclusion reached in the supplemental opinion? The appeals in both proceedings are before us, and have been submitted and considered together. The facts are all in the record, and, as a court of equity, we should see that a result is reached which neither does injustice to the

parties nor establishes an unsound precedent. There should be no decree quieting Griffin's title in No. 2,300, but, if we adhere to the holding that the notice in that proceeding was not served in time, the case should be simply dismissed, without prejudice to the rights of either party in the other action. The petition for rehearing in No. 2,300 should therefore be granted, and the decree of the district court reversed. The decree in No. 572 should also be reversed. I adhere to my views expressed on the first hearing as to the sufficiency of the service of notice in each of the cases before us, but do not desire to extend this dissent by further consideration of that point.

McClain, J., concurs in the foregoing dissent.